**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

     **vs.**                                                    **1:13-cr-205**
                                                              **(MAD)**
**RICHARD ELY,**

                           **Defendant.**
_____

APPEARANCES:                          OF COUNSEL:

**OFFICE OF THE UNITED**              **WAYNE A. MYERS, AUSA**
**STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207
Attorneys for the United States

**OFFICE OF DANIELLE NERONI**         **DANIELLE NERONI, ESQ.**
P.O. Box 8446
Albany, New York 12208
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On May 9, 2013, Defendant was indicted for possessing a firearm in violation of 18

U.S.C. §§ 922(g)(1) and 924(a)(2).  *See* Dkt. No. 4.  Specifically, the grand jury indicted

Defendant, previously convicted of a felony, for unlawfully possessing a loaded Ruger Single Six

.22 caliber revolver (the "Ruger") on June 7, 2012.  *See id.*

Currently before the Court is Defendant's motion seeking the following relief: (1) an

Order dismissing the Indictment as insufficient and defective based on insufficient evidence; (2)

an Order requiring the Government to provide an adequate Bill of Particulars; (3) preclusion at

trial of uncharged crimes evidence pursuant to Rule 404(b) of the Federal Rules of Evidence; (4) an Order suppressing all evidence obtained from Defendant's arrest in June 2012 as alleged in the Indictment as the product of an unlawful arrest and/or search and seizure; (5) an Order requiring the Government to reveal the identity of any and all informants; (6) an Order pursuant to *Brady v. Maryland* and its progeny requiring the Government to disclose all evidence; (7) an Order suppressing any statements allegedly made by Defendant; and (8) an Order permitting Defendant to join in the motions of other defendants.  *See* Dkt. No. 16.

## II. BACKGROUND

**A.    Factual allegations**

On the morning of June 7, 2012, relying on a search warrant issued by Judge Thomas K. Keefe of Albany City Court, members of the Albany Police Department, including Detective Lawrence Heid, searched an apartment leased to Defendant's girlfriend, Jannie Philpot, located at 677 Pawling Avenue, #2, Troy, New York, where Defendant reportedly resided.  The warrant authorized police to search for a handgun, and other evidence of a shooting, based on video surveillance and eyewitness testimony indicating that Defendant fired shots at someone with a handgun on March 25, 2012, near a Hoffman Car Wash off Central Avenue in Albany, New York.

Defendant was present during the June 7, 2012 search.  Defendant claims that he slept at Philpot's apartment the night of June 6, 2012.  During the search, police found the Ruger in Philpot's apartment building hidden behind a loose brick in a stairway leading to a basement area. The stairway is accessible by a ground-level trap door, which is located in an enclosed porch appurtenant to Philpot's apartment, and used by Defendant and Philpot to store their belongings.

2

After police found the Ruger, Detective Heid arrested Defendant, placed him in a police car, and transported him to the station. On the way to the police station, and before police read Defendant his *Miranda* rights or asked him about the Ruger, Defendant repeatedly told Detectives Heid and Haggerty that the Ruger was his. At that point, Detective Heid instructed Defendant to stop talking and explained that they would talk at the station.

At the police station, detectives placed Defendant in an interview room. Initially, Defendant made small talk with Detectives Heid and Haggerty for approximately two minutes, during which time they removed his handcuffs. At 8:56 a.m., as the conversation continued, but before Defendant was read his *Miranda* rights, Detective Heid said to Defendant "It's like you said, the um, I know we had some conversation on the way over here, you were saying that the gun's yours. And we, we left. How many rounds were in it?" According to the Government, Defendant responded as follows: "There's bullets there, man. You don't have to play this dumb shit with me. See what I'm saying? That's my gun. The bullets with it is mine. So everything you found there is mine." At that point, Detective Heid read Defendant his *Miranda* rights. Defendant acknowledged that he understood his rights, then continued to talk with the detectives. The Government claims that Defendant stated once again that the Ruger was his and, further, that it was connected to the March 25, 2012 shooting.

In his motion, Defendant contends, among other things, that the indictment should be dismissed because it is too vague and does not establish that the Ruger affects interstate commerce. Further, Defendant claims that the evidence seized during the June 7, 2012 search, including the Ruger, should be suppressed because Judge Keefe relied on insufficient and stale information in issuing the search warrant. Finally, Defendant asserts that all of his confessions were involuntary and, therefore, should be suppressed.

**B.**     **Suppression Hearing**

On September 6, 2013, the Court held a suppression hearing.  The hearing was continued

on September 13, 2013.  At the start of the hearing, the Government identified the two issues to

be addressed: (1) should Defendant's June 7, 2012 statements to police, made while in the police

vehicle on the way to the police station and while at the site of the search, be admitted at trial; and

(2) whether Judge Keefe had probable cause to issue the warrant to search the apartment at 677

Pawling Avenue.  *See* Transcript of Suppression Hearing dated Sept. 6, 2013 ("Tr. # 1") at 2-3.

As to the second issue, the Government argued that the Court should not look beyond the four

corners of the affidavit because Defendant failed to make a substantial preliminary showing that

the affiant made a false statement, that the false statement was made knowingly and intentionally

or with reckless disregard of the truth, and that the false statement was essential to the judge's

finding of probable cause.  After Defendant's counsel summarized Defendant's position, the Court

ruled that, in an abundance of caution, it would permit Defendant to present evidence regarding

the alleged false statements made in the affidavit in support of the search warrant application.


### *1. Direct examination of Detective Heid*

For its first witness, the Government called Detective Lawrence Heid.  *See id.* at 10.  After

discussing his training and sixteen-year career with the Albany Police Department, Detective

Heid testified about the incidents surround the present case.  On March 25, 2011, Detective Heid

was driving around the city with his partner, Detective Haggerty, when a call went out for shots

fired in the area of Bradford Street behind Hoffman's Car Wash.  *See id.* at 12.  Although they

were unable to secure any evidence when they first responded to the scene, they eventually

received a security camera recording that showed a "black male wearing a dark hooded sweatshirt

walking down the street westbound on Bradford and it shows him firing at a – I believe a Honda – small Honda car driving, who drove away eastbound." *See id.* at 13.  Detective Heid further testified that, after the Honda went off screen, a "few moments later it showed a dark, highly-tinted Audi station wagon driving southbound on North Main and then it shows the Honda coming back towards the scene, doing a U-turn after it passes the station wagon, and then they go off camera." *See id.*

Detective Heid testified that they were able to eventually identify the intended victim of the shooting as Anthony Payne, as well as another individual who was present at the car wash that day, Larry Wilburn.  *See id.* at 14.  Sometime in late May, Detective Heid met with Mr. Payne and Mr. Wilburn at the Albany County Jail.  *See id.* at 15.  Mr. Payne and Mr. Wilburn had recently been arrested and charged on crimes unrelated to this incident.  *See id.*  Detective Heid asserted that Mr. Payne and Mr. Wilburn provided him with information that allowed him to put together a photo array of who he believed they were identifying.  *See id.*  When showed the photo array, both individuals selected Defendant as the person firing the weapon on March 25, 2012. *See id.*

After both witnesses identified Defendant, Detective Heid and his partner looked up Defendant's Facebook account which demonstrated that, as of January 2012, he was driving a vehicle that matched the description of the vehicle seen fleeing from Hoffman's Car Wash.  *See id.* at 16-17.  Further, the detectives were able to discern the vehicle's license plate in the photo. *See id.*  The detectives ran the license plate through their database, which provided that the vehicle was a 2003 Audi station wagon, registered to Miss Philpot, Defendant's girlfriend.  *See id.* at 17-18.  In one of the photographs pulled off of Facebook, Defendant is shown standing in front of the Audi Station Wagon; this photograph, however, does not depict the license plate of the

5

vehicle. *See id.* Detective Heid believes that he first saw this photograph on May 29, which was before he submitted the search warrant application to Judge Keefe. *See id.* at 19.

Detective Heid also testified that their review of the police database revealed that Defendant was arrested on January 2, 2012. *See id.* at 20.[1] The police report indicated that Defendant was arrested for weapons possession (switchblade knife) and driving with a suspended license. *See id.* at 22-23. Although the report does not indicate the vehicle Defendant was driving at the time, it simply provided that the New York State license plate number of the vehicle was FWR1264. *See id.* at 23. Upon receiving this arrest report, Detective Heid testified that he had another detective run the license plate "and it came back with a hit of – to the 2003 Audi station wagon. *See id.*

Thereafter, the Government introduced reports describing the history of vehicles linked to New York State license plate FWR1264. *See id.* at 24. These reports establish that the license plate was previously linked to a 1992 Acura, but that it is currently linked to a 2003 Audi station wagon. *See id.* at 25. Further, the reports indicated that Defendant was stopped for a traffic violation on January 2, 2012 while driving the 2003 Audi station wagon. *See id.* at 28.

Detective Heid testified that, based on the information in their databases, they first believed that Defendant was residing at 42 Morris Street in Albany, New York. *See id.* at 29. As such, they went to that address hoping to observe Defendant or Ms. Philpot's Audi, so that they could serve a search warrant. *See id.* They determined that this address was linked to Defendant

---

[1] Although the police report indicates that the arrest occurred on January 2, 2011, Detective Heid testified that this was, in fact, an error and that the arrest occurred on January 2, 2012. Detective Heid admits that he incorrectly stated that the incident occurred on January 2, 2011 in the affidavit in support of the search warrant application. *See* Tr. # 1 at 20-22. The case number on the report, however, was "12-1810," which indicates that the report was generated in 2012, not 2011. *See id.* at 21.

because he and Ms. Philpot had several domestic reports filed while they were living there. *See id.* When they failed to observe Defendant or the vehicle at this residence, however, they made no attempt to serve a search warrant there. *See id.*

Thereafter, on June 5, 2012, Detective Heid learned that Ms. Philpot and perhaps Defendant were currently residing at 677 Pawling Avenue in Troy, New York. *See id.* at 30. Through their records, the Troy Police Department had taken domestic reports on June 3 and 4, regarding incidents involving Defendant and Ms. Philpot. *See id.* at 30-33. The June 3, 2012 report indicates that, on that day, the Troy Police were called to respond to a domestic incident at 677 Pawling Avenue, involving Defendant and Ms. Philpot. *See id.* at 32. The report does not indicate that Defendant no longer resides at the address and, in fact, indicates that he still has a set of keys to the apartment. *See id.* The June 4, 2012 report documents another domestic incident to which the Troy Police responded involving Defendant and Ms. Philpot at 677 Pawling Avenue. *See id.* at 33. The documents lists 677 Pawling Avenue as the address for both Ms. Philpot and Defendant; but, a check is marked under "no" in the box provided to indicate whether they live together. *See id.* at 33-34. The report details an incident in which Defendant threatened Ms. Philpot in a text message. *See id.* at 34. According to the report, when Ms. Philpot returned home, she found her clothes damaged by having bleach poured on them. *See id.* Ms. Philpot indicated to the responding officers that she and Defendant were the only ones who had access to the apartment. *See id.* at 35. Although Ms. Philpot indicated that Defendant turned his key over to her the previous day, the report implies that Defendant still had a key to the apartment because there was no visible sign of forced entry. *See id.* at 35-36.

Detective Heid testified that, upon receiving these reports from the Troy Police, he and his partner drove to 677 Pawling Avenue to conduct reconnaissance on the address. *See id.* at 36-37.

7

The detectives did not get out of their vehicle to inspect the building because there were "a lot of people in the street;" rather, they simply drove past the building to determine its location and circled completely around the block so that they were able to view the rear of the building as well. *See id.* at 37-38.  When they passed by the front of the house, they were "able to observe the very distinctive Audio station wagon."  *See id.* at 38.  Detective Heid clarified what he meant by "distinctive," indicating that "it has very large, after-market rims, after-market – my opinion is an after-market paint job, it's very bright and almost mirrored tints."  *See id.*  Detective Heid confirmed that the Audi parked in front of 677 Pawling Avenue matched the car scene in the Facebook photograph with Defendant.  *See id.* at 39.

The following evening the detectives conducted similar reconnaissance and then, on June 6, Detective Heid prepared the search warrant application for that address.  *See id.* at 40.  Judge Keefe signed the search warrant in the evening of June 6, 2012.  *See id.* at 46.  At 7:30 a.m., on June 7, 2012, Detective Heid, among others, executed the search warrant at 677 Pawling Avenue. *See id.*

Detective Heid testified that, when they knocked on the door at 677 Pawling Avenue, Defendant opened the door and he was holding a young child.  *See id.* at 49.  Defendant was directed to put the child down, and the officers placed him in handcuffs so that they could safely conduct the search.  *See id.*  No other individuals were in the apartment at that time.  *See id.*  Eventually, Detective Heid found a black revolver wrapped in a black cloth.  *See id.* at 50. Detective Heid described where he found the gun as follows:

> Off the rear porch or off the kitchen of the Apartment 2 there's a rear porch that's connected to their apartment.  On that rear porch there's stairs through a Bilco door.  There's stairs leading downstairs.  When you open the Bilco door, you start to walk down the stairs.  Once you get to about eye level with where the porch is, you notice there's a brick stairway, and there's an open area and the

> gun was found inserted behind, like, the bricks just as you're
> entering or exiting the steps going down toward the basement.

*See id.*

Thereafter, Detective Heid testified that, on January 27, 2012, Defendant was arrested for menacing another person with a black revolver. *See id.* at 55. According to the police report, the handgun from that alleged offense was not recovered. *See id.* at 56. Detective Heid indicated that he reviewed the police report associated with that arrest on May 29, 2012. *See id.* at 55.

When Detective Heid located the gun at 677 Pawling Avenue, he informed his sergeant so that they could process the weapon. *See id.* at 57. Once Detective Heid was relieved from where the gun was, he and Detective Haggerty brought Defendant to the Albany police station. *See id.* at 58. Defendant, who was in handcuffs, was placed in the back of their vehicle. *See id.* Defendant was not read his *Miranda* warning at this time. *See id.*

Detective Heid claims that they did not ask Defendant any questions, aside from whether he wanted coffee, once he was placed in the vehicle. *See id.* at 58-59. As they were pulling away from Defendant's apartment, "the first thing he actually or one of the first things he said to us is that Jannie didn't know about that gun and that it was his." *See id.* at 59. Defendant eventually asked the detectives several questions, to which Detective Heid "told him specifically we will talk about it when we get down to the station, I can't talk to him right now while we are driving and he asked how much time he could get for the gun." *See id.* at 59-60.

When they arrived at the police station, they placed Defendant in the interview room and activated the video recording device. *See id.* at 60. After the detectives secured their weapons and vests, they returned to the interview room. *See id.* at 62. At this point, the detectives removed Defendant's handcuffs, "sought Mr. Ely's personal comfort a little bit, and then just had a brief introductory period before we – I read his *Miranda* rights and began our interview." *See id.*

Prior to reading Defendant his *Miranda* warnings, Detective Heid asked Defendant if he needed water, asked about Ms. Philpot, and then eventually asked him about the gun that was found at 677 Pawling Avenue. *See id.* at 63. Regarding the gun, Detective Heid testified that he specifically asked him if the gun was loaded and, if so, how many rounds were in it. *See id.* Detective Heid claims that he asked this question because "[t]he forensics detective that was handling the weapon was trying to swab it for DNA and opened the cylinder to make it safe prior to doing so and was having difficulty handling it or opening – the cylinder." *See id.* According to Detective Heid, in response to the question, Defendant "went on talking about – that it was loaded, in sum and substance, that it was . . . loaded and couldn't give me a number how many rounds[.]" *See id.* at 64. Further, Defendant responded that it was his gun. *See id.*

At this point, Defendant was read his *Miranda* warnings. *See id.* at 65-66. Although Defendant responded that he understood each of the rights that were read to him, Detective Heid does not believe that he read him the section of the *Miranda* warnings regarding "waiver" of his rights. *See id.* At this point, Defendant was shown the video from the surveillance camera depicting the alleged shooting and admitted that it was him in the video shooting at Anthony Payne, that he was driving the Audi that day, and that the gun they found at 677 Pawling Avenue was his. *See id.* at 67-68. After receiving his *Miranda* warnings, Defendant did not ask to stop the interview, did not ask for an attorney, and did not indicate that he wanted to remain silent. *See id.* at 68. The interview concluded when Defendant indicated that he did not want to put anything in writing. *See id.*

*2. Cross examination of Detective Heid*

On cross examination, Detective Heid again testified about his surveillance of 677 Pawling Avenue. *See id.* at 74-75. Detective Heid admitted that, although he saw an Audi station wagon parked in the driveway at 677 Pawling Avenue that appeared to be vehicle in the security camera footage, he could not see the license plate from where he was located. *See id.* at 75. In fact, Detective Heid acknowledged that, upon executing the search warrant, there were no license plates on the vehicle because it was "unregistered" as of June 6, 2012. *See id.* at 75-76. Further, Detective Heid admitted that, although he asked for permission to search common areas, the rear porch, and a detached garage in the search warrant application, he did not know at the time whether the property had any of these attributes. *See id.* at 76-77.

Thereafter, Detective Heid admitted that he did not include in the application that Anthony Payne first told him that Defendant was not involved in the shooting. *See id.* at 78. Detective Heid further admitted that the application did not contain any information indicating that Defendant has "ever been known to have a gun at his residence." *See id.* at 79. Defendant's counsel also questioned Detective Heid about the fact that he only included the June 3 and not the June 4 domestic incident report with the application – *i.e.*, he only included the one that indicated that the parties lived together. *See id.* at 80.

Detective Heid also explained why he came to the conclusion that Defendant no longer lived at 42 Morris Street and was, in fact, now residing at 677 Pawling Avenue. *See id.* at 82-83. He reached this conclusion based on the surveillance he conducted at 42 Morris Street and the domestic incident reports relating to 677 Pawling Avenue. *See id.*

Thereafter, Detective Heid admitted that, when Defendant was pulled over in January 2, 2012, the car he was driving was not a 2003 Audi station wagon. *See id.* at 84-85. He also noted, however, that the vehicle he was driving had a New York license plate number FWR1264. *See*

12

*id.* Therefore, the warrant application incorrectly states that he was stopped on January 2, 2012 in the Audi. *See id.* at 86.[2]

Detective Heid was next questioned about his interview of Defendant at the police station and the statements made while Defendant was being transported to the station. *See id.* at 110-115. Detective Heid admitted that, prior to giving Defendant his *Miranda* warnings, he asked Defendant whether the gun was loaded. *See id.* at 113-114. Further, Detective Heid admitted that, although he read the *Miranda* warnings from a standard card, he did not read the portion relating to Defendant waiving his rights. *See id.* at 114-115. Specifically, Detective Heid testified that, although he asked Defendant if he understood his rights, he did not then ask "'[h]aving these rights in mind, do you wish to talk to us now?'" *See id.* at 115. Rather, he simply proceeded to question Defendant. *See id.*

### 3. Testimony of Jannie Philpot

When the hearing resumed on September 13, 2013, Defendant called Jannie Philpot as his only witness. *See* Transcript of Suppression Hearing dated Sept. 13, 2013 ("Tr. # 2") at 2. Ms. Philpot testified that, when she moved into the apartment at 677 Pawling Avenue, Defendant did not reside with her. *See id.* at 3-4. She further stated that Defendant did not reside with her in June of 2012, but admitted that they were dating and that he would occasionally spend the night. *See id.* at 4-5. Moreover, Ms. Philpot testified that, on the date that the second incident report was filed, the locks to her apartment were changed. *See id.* at 8. According to Ms. Philpot, Defendant did not receive any mail or bills at 677 Pawling Avenue. *See id.* at 23.

---

[2] Defense counsel spent considerable time questioning Detective Heid about whether Defendant was, in fact, residing at 677 Pawling Avenue. *See id.* at 91-94, 101-105.

Ms. Philpot also testified that, when she moved into the apartment at 677 Pawling Avenue, she removed the license plates from her Audi station wagon and parked it behind the residence, due to mechanical issues she was having with the vehicle. *See id.* at 10-11. Moreover, Ms. Philpot testified that it is impossible to see the back of her apartment or where the Audi was parked from the road because the view is obstructed by a fence, bushes and trees. *See id.* at 14-15. Further, Ms. Philpot testified that, in May and June of 2012, her vehicles were still registered to 42 Morris Street. *See id.* at 22.

## III. DISCUSSION

### A.    Dismissal of the Indictment

Defendant contends that the Indictment must be dismissed because it "fails to properly notify defendant of the substance of the charged crime, in that it fails to contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *See* Dkt. No. 16-1 at 2 (quoting Fed. R. Crim. P. 7(c)(1)) (other citations omitted). Further, Defendant claims that the evidence is insufficient to establish that Defendant knowingly possessed a firearm "'in and affecting commerce.'" *See id.* at 3.

"'An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.'" *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)). As the Second Circuit has consistently held, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Id.* (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)).

Moreover, "Federal Rule of Criminal Procedure 7(c) requires only that an indictment be 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* (quoting Fed. R. Crim. P. 7(c)).

In the present matter, the Indictment tracks the language of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), and identified Defendant as being in possession of the Ruger on June 7, 2012. *See* Dkt. No. 4. Specifically, the Indictment provides that, "[o]n or about June 7, 2012, in the State and Northern District of New York, the defendant, **RICHARD S. ELY**, having previously been convicted in court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce a firearm, that is: a loaded Ruger Single Six, .22 caliber revolver, bearing serial number 831129." *See id.* Title 18, United States Code, Section 922(g)(1) provides as follows: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate of foreign commerce." 18 U.S.C. § 922(g)(1). The language of the Indictment tracks that of the statute and states the approximate time and place of the alleged crime, thereby providing sufficient detail to inform Defendant of the charge against which he must defend. *See United States v. Wells*, 826 F. Supp. 2d 441, 444 (N.D.N.Y. 2011).

Further, to the extent that Defendant argues that the Indictment must be dismissed because it has not been established that Defendant knowingly possessed a firearm "in and affecting commerce," the argument must fail. It is well-established in this Circuit that section 922(g) requires only a "minimal nexus" to interstate commerce, which can be satisfied by a showing that the firearm at issue traveled at any time in interstate commerce. *See United States v. Gaines*, 295

F.3d 293, 302 (2d Cir. 2002); *United States v. Frias*, 521 F.3d 229, 235 (2d Cir. 2008) (holding

that "an indictment 'need only track the language of the statute and, if necessary to apprise the

defendant of the nature of the accusation against him, state time and place in approximate

terms'"); *United States v. Santiago*, 238 F.3d 213, 216-17 (2d Cir. 2001);  *United States v.

Palozie*, 166 F.3d 502, 505 (2d Cir. 1999); *United States v. Sorrentino*, 72 F.3d 294, 297 (2d Cir.

1995).  "Testimony that a weapon was manufactured out of state is generally sufficient to meet

the interstate commerce element."  *United States v. Jones*, 16 F.3d 487, 491 (2d Cir. 1994)

(citation omitted); *see also United States v. Sanders*, 35 F.3d 61, 62-63 (2d Cir. 1994) (collecting

cases holding that the "in commerce element of § 922(g) is satisfied where ammunition possessed

by defendant had been manufactured elsewhere and passed through interstate commerce before

defendant possessed ammunition"); *United States v. Chin*, 910 F. Supp. 889, 894 (E.D.N.Y. 1995)

("Evidence that ammunition was manufactured outside of New York State, and that defendant

was found in possession of that ammunition within the State, compels the conclusion that the

ammunition crossed state lines at some point").

     Based on the foregoing, the Court denies Defendant's motion to dismiss the Indictment.


**B.**    **Bill of Particulars**

     Defendant contends that, since the Indictment fails to properly notify Defendant of the

substance of the charges against him, the Government should be required to provide detailed

information in the form of a Bill of Particulars, pursuant to Rule 7(f) of the Federal Rules of

Criminal Procedure.  *See* Dkt. No. 16-1 at 3.  Specifically, Defendant requests that the

Government provide the following information: (1) How the firearm allegedly possessed by

Defendant moved in interstate commerce; (2) the location where the firearm was manufactured;

and (3) how Defendant allegedly obtained the firearm, and specifically whether Defendant obtained the firearm in New York or outside of the State.  *See id.*

A court should grant a motion for a bill of particulars only where necessary to inform the accused of the charge against him with sufficient precision to enable him to prepare her defense and avoid surprise and to enable him to plead his acquittal or conviction in bar of any further prosecution for the same offense.  *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted); *see also United States v. Macchia*, 35 F.3d 662, 670 n.1 (2d Cir. 1994) (quotation and other citations omitted).  The purpose of a bill of particulars is to apprise the defendant of the essential facts of the crime with which he is charged; it is not an investigative vehicle for the defense.  *See United States v. Johnson*, 21 F. Supp. 2d 329, 339 (S.D.N.Y. 1998) (citation omitted).  "The test is not whether the particulars sought would be useful to the defense. Rather, a more appropriate inquiry is whether the information in question is necessary to the defense."  *United States v. Guerrerio*, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987) (citation omitted).  Moreover, if the government has provided the defendant with the information he seeks from another source, *i.e.* through discovery, no bill of particulars is required.  *See United States v. Laughlin*, 768 F. Supp. 957, 967 (N.D.N.Y. 1991) (citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)).

As discussed above, the Indictment was sufficient "'to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.'"  *Yannotti*, 541 F.3d at 127 (quotation omitted).  It is clear that Defendant has been adequately informed of the charges against him so that he can prepare a defense, avoid surprise, and plead his acquittal or conviction in bar of any further prosecution for the same offense.  Moreover, Defendant was provided with an April 19, 2013 ATF report which

details how the Ruger moved in interstate commerce. *See* Dkt. No. 17 at 14. Through both the Indictment and discovery, the Government has provided Defendant with the required information and Defendant is merely seeking to use a bill of particulars as an investigative tool.

Based on the foregoing, the Court denies Defendant's motion for a bill of particulars.

**C.     Preclusion of uncharged crimes evidence pursuant to Fed. R. Evid. 404(b)**

Defendant requests that the Court issue an Order pursuant to Rule 404(b) of the Federal Rules of Evidence precluding the introduction of evidence of any other crimes or bad acts allegedly committed by Defendant. *See* Dkt. No. 16-1 at 4. The Government contends that it intends to introduce such evidence in its case-in-chief at trial, but that it has not determined which prior bad acts it may seek to introduce. *See* Dkt. No. 17 at 14.

In light of the fact that neither party has identified any other crimes or bad acts that may be introduced at trial, the Court is unable to determine whether such evidence would be admissible. As such, the Court denies Defendant's motion to preclude such evidence, without prejudice to renew.

**D.     Suppression of physical evidence seized from Defendant's person and/or home**

*1. Sufficiency of the search warrant application*

Defendant contends that he "was seized on less than probable cause" and that the evidence against him "was obtained in violation of his rights under the Fourth Amendment of the United States Constitution and Fed. R. Crim. P. 41, as it was the result of an illegal search pursuant to an invalid search warrant." *See* Dkt. No. 16-1 at 5. Defendant contends that the search warrant issued by Judge Keefe was defective. *See id.* Defendant claims that Judge Keefe did not have

"cause, 'reasonable,' 'probable,' or otherwise, 'to believe that the specific "things" to be searched for and seized [were] located on the property to which entry [was] sought' at the time the warrant was issued." *See id.* at 8.  Specifically, Defendant alleges that "all of the 'affidavits' annexed to the search warrant application deal with identification of defendant and there is not one affidavit indicating that the affiants know defendant to keep a weapon at the premises described in the search warrant.  Similarly, there is no information whatsoever that anyone has ever been to the premises described in the search warrant or that anyone has ever observed a handgun or firearm at the premises." *See id.*  As such, Defendant claims that no information was presented that would "provide reasonable cause to believe that contraband would be found at the premises and there certainly was not probable cause to believe that a gun would be found therein." *See id.*

   "In determining whether probable cause for a search warrant exists, the issuing judicial officer is simply to make a practical common sense decision whether, given the 'totality of the circumstances' set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Barnes*, 399 F. Supp. 2d 169, 178 (W.D.N.Y. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)); *see also United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991).  A "magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of this warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983); *see also United States v. Ventresca*, 380 U.S. 102, 106 (1965) (holding that a magistrate's disinterested finding of probable cause based on reasonable inferences is given preference).  "The process does not deal with hard certainties, but with probabilities." *Gates*, 462 U.S. at 230; *see also United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985) ("Probable cause to believe certain items will be found in a

19

specific location . . . need not be based on direct, first-hand, or 'hard' evidence") (internal citation omitted).

There is no requirement that an affidavit must contain factual information directly linking items sought to a particular residence. *See United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) ("A showing of nexus does not require direct evidence and 'may be based on "reasonable inference" from the facts presented based on common sense and experience'") (quotations omitted). Courts have found that, in the case of firearms, it is reasonable to infer that it is the type of evidence likely to be kept in a suspect's residence. *See, e.g., United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993).

In the present matter, the search warrant application was supported by an affidavit submitted by Detective Heid dated June 6, 2012. *See* Dkt. No. 17-1 at 2-3. The application sought the following items from 677 Pawling Avenue, #2, Troy, New York: (1) any and all handguns, both real or imitation; (2) any gun cleaning equipment, ammunition, holster or any other items that would indicate possession of a firearm; (3) any paperwork, mail or identification that indicates residency by Richard Ely; (4) the person of Richard Ely; and (5) a black hooded sweatshirt. *See id.* at 2. Further, the following factual allegations were submitted in support of the application:

> On 03/25/2012 at 5:38 pm the Albany Police Department received a call to the area N. Main Ave/Bradford Street for shots fired. Upon arrival, this Deponent interviewed a witness who called 911, . . . who stated that he heard several shots fired then saw a black male running from the scene and flee in an Audi station wagon with dark tinted windows. This deponent interviewed the intended victim, Anthony Payne, who states that a person he knows, Richard Ely (05/05/1986), fired three rounds at him from a revolver. Mr. Payne states that Ely then left in a blue Audi wagon with mirrored tints. This deponent subsequently interviewed another witness . . . who also identified Richard Ely as the person who fired a handgun at the victim, Anthony Payne. This incident was captured on video from

the Hoffman's Car Wash and indeed shows a black male wearing a black hooded sweatshirt shooting at Anthony Payne, who was driving away in his vehicle. Also on this video an Audi wagon is observed leaving the scene just after the shooting incident. On 01/02/2011 Mr. Ely was stopped by the Albany Police Department while driving NY Registration FWR1264, a blue 2003 Audi Wagon registered to his girlfriend, Jannie Philpot. On 06/04/2012 Mr. Ely and Ms. Philpot had a Domestic Incident at their residence at 677 Pawling Ave, Troy NY which was documented at the Troy, NY Police Department. It is the belief of this deponent that a search of Mr. Ely's residence at 677 Pawling Ave, Troy NY will assist in this reckless endangerment/weapons possession investigation.

*See* Dkt. No. 17-1 at 2.

Moreover, the search warrant application was supported by statements from Anthony Payne (the alleged victim), and a photo array in which Mr. Payne and another witness identified Defendant. *See id.* at 4-10. Finally, the application included a "Domestic Incident Report" dated June 4, 2012, which linked Defendant to 677 Pawling Avenue. *See id.* at 11-12.

As the Government correctly contends, the information provided to Judge Keefe sufficiently established a reasonable likelihood that police would find evidence of the March 25, 2012 shooting at Philpot's apartment. The affidavit and accompanying attachments provided considerable evidence that Defendant was involved in the March 25, 2012 shooting. Detective Heid's affidavit attached and described statements from two eyewitnesses identifying Defendant. It also described video surveillance from a Hoffman's Car Wash showing a man fitting Defendant's description shooting a handgun at another man and then driving away in a blue 2003 Audi station wagon, and that it was later determined that Defendant's girlfriend, Ms. Philpot, has the same model car registered in her name.

Moreover, the application provided substantial evidence that Defendant resided at Ms. Philpot's apartment. The application includes and describes a June 4, 2012 Domestic Incident Report documenting an altercation between Defendant and Ms. Philpot that occurred at Ms.

Philpot's apartment.  The evidence demonstrated that Defendant and Ms. Philpot were in a long-term relationship and that the two resided at Ms. Philpot's apartment.  Although Defendant contends that Judge Keefe should have realized that, based on the Domestic Incident Report, Defendant no long resided at Ms. Philpot's apartment, a closer inspection of the report reveals that Defendant continued to access the apartment after he allegedly gave his apartment key to Ms. Philpot on June 3, 2012.  *See* Dkt. No. 17-1 at 12.  This report, combined with the fact that Defendant was pulled over while driving Ms. Philpot's car January 2012, provided adequate grounds for Judge Keefe to conclude that Defendant had access to Ms. Philpot's apartment after June 3, 2012 and, further, that he had been residing their for some time.[3]

### 2. Staleness

Defendant contends that the search warrant was defective because it was based upon stale information.  *See* Dkt. No. 16-1 at 9.  Further, Defendant contends that the supporting affidavits contain allegations of a solitary shooting incident some two months prior to the application for the search warrant, and that there were no allegations of ongoing or continuing criminal activity.  *See id.* at 10.  As such, Defendant contends that there could be no reasonable belief, "except upon the purest conjecture, that the 'weapon' allegedly observed in the video of March 25, 2012, was located at the residence located at 677 Pawling Avenue, #2, Troy, New York."  *See id.* at 10-11.

---

[3] Defendant spent much of the suppression hearing trying to establish that he did not reside with Ms. Philpot at 677 Pawling Avenue when the search warrant was executed.  The evidence and testimony at the hearing, however, support the opposite conclusion.  Even if the Court were to believe Defendant, his argument would not provide him the relief he seeks.  Rather, if Defendant had moved out of 677 Pawling Avenue, he wold lack standing to challenge the search because he would not have a personal expectation of privacy in the area searched.  *See United States v. Russell*, 501 Fed. Appx. 67, 70 (2d Cir. 2012) (citing *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002)).

There is no "arbitrary 'cut-off' expressed in days or weeks beyond which probable cause ceases to exist[.]" *United States v. Beltempo*, 675 F.2d 472, 478 (2d Cir. 1982). Rather, courts should resolve staleness challenges through a flexible, common sense inquiry into whether probable cause existed at the time the warrant was issued. *See id.* In conducting this inquiry, the court must consider the amount of time that has passed, the kind of property sought, and the nature of the underlying criminal activity. *See United States v. Singh*, 390 F.3d 168, 181-82 (2d Cir. 2004). "Moreover, when the supporting facts 'present a picture of continuing conduct or an ongoing activity, . . . the passage of time between the last described act and the presentation of the application becomes less significant.'" *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998) (quotation omitted).

Contrary to Defendant's assertions, the information upon which the search warrant was based was not stale. The search warrant application clearly sets forth the fact that Defendant was residing with Ms. Philpot at her apartment as late as June 3, 2012, and still had access to the apartment as evidenced by the June 4, 2012 incident. Moreover, the police did not obtain written statements from the two eyewitnesses identifying Defendant as the shooter until May 31, 2012. *See* Dkt. No. 17-1 at 5-10. Police sought the search warrant for Ms. Philpot's apartment less than one week later. Given the nature of the criminal conduct – possession of a firearm – and the fact that Defendant had been observed with a handgun on numerous occasions, including the March 25, 2012 shooting and the January 2012 menacing incident, Judge Keefe reasonably concluded that Defendant likely continued to possess one or more handguns and that evidence of the March 25, 2012 shooting would still be found in Ms. Philpot's apartment. *See United States v. Deering*, 296 Fed. Appx. 894, 898 (11th Cir. 2008) (holding a search warrant seeking a firearm in a residence valid even though the information relied upon was eighty-five days old); *see also*

*United States v. Lester*, 285 Fed. Appx. 542, 546 (10th Cir. 2008) (holding that information approximately one-year old regarding the defendant's possession of firearms was not stale so as to preclude a finding of probable cause because the firearms in question were not "fluid commodities" and because a firearms violation is a "continuing offense[]" (citations omitted)).

Based on the foregoing, the Court denies Defendant's motion on this ground.


### *3. Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)

On August 30, 2013, the Government filed a letter stating its position that the suppression hearing should be limited to the statements made by Defendant on June 7, 2012. *See* Dkt. No. 24. In response to that letter, Defendant's counsel filed a letter stating that "[i]t is defendant's position that the police made willfully false statements and reckless statements and these statements undercut the finding of probable cause." *See* Dkt. No. 25. Defendant alleges that the affidavit in support of the search warrant incorrectly states that "'on 1/02/2011 Mr. Ely was stopped by the Albany Police Department while driving NY Registration FWR 1264, a blue 2003 Audi Wagon registered to his girlfriend, Jannie Philpot.'" *See id.* Defendant asserts that the arrest report is actually from January 2, 2012, not 2011, and that Ms. Philpot did not purchase the blue Audi station wagon until February 2012. *See id.* at 1-2. Further, Defendant claims that Detective Heid failed to inform Judge Keefe that the June 4, 2012 domestic incident report stated that Defendant had "'turned over his apartment key and both parties went on their way.' The landlord was then contacted to expedite a change of the locks. By all accounts, defendant and Jannie Philpot had a dispute and defendant was no longer living at this residence." *See id.* at 2. Finally, Defendant

argues that the affidavit incorrectly implies that there are "detached garages and sheds" at 677 Pawling Avenue. *See id.*[4]

On September 3, 2013, the Government filed a motion *in limine* to limit the scope of the suppression hearing and to deny Defendant's request for a *Franks* hearing. *See* Dkt. No. 26. The Government argues that Defendant has not meet its burden of production establishing that the search warrant was based on less than probable cause; and, therefore, no hearing is required. *See id.* at 2. Further, the Government asserts that the Court should deny Defendant's request for a *Franks* hearing because Defendant's claims "fall far short of establishing the 'substantial preliminary showing' necessary to warrant a *Franks* hearing." *See id.* at 3 (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)).

The Government is correct that Defendant failed to make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that the "allegedly false statement [was] necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Defendant failed to submit "[a]ffidavits or sworn or otherwise reliable statements of witnesses" detailing the allegedly false statements in support of his application. *See id.* at 171. Defendant merely states in his affidavit in support of his original motion that he "reviewed the search warrant application and observed numerous errors." *See* Dkt. No. 16-2. This conclusory assertion fails to meet his burden.

---

[4] As the Government correctly contends, in its motion, Defendant does not raise these arguments. Although it is clear from this letter that Defendant is now seeking a *Franks* hearing in addition to the relief previously requested, Defendant fails to cite to *Franks v. Delaware*, 438 U.S. 154 (1978) or any other case discussing the relevant standard.

Despite this, at the suppression hearing the Court "err[ed] on the side of caution" and permitted Defendant to pursue this line of inquiry.  As such, the Court will now address Defendant's arguments regarding the allegedly false statements contained in the affidavit submitted in support of the search warrant.

The Fourth Amendment prohibits "unreasonable searches and seizures," and the Warrants Clause mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant."  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (footnote and citations omitted).  "However, '[e]very statement in a warrant affidavit does not have to be true.'"  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quotation omitted).

In *Franks v. Delaware*, the Supreme Court held that a defendant may challenge the validity of a search warrant alleged to contain deliberately or recklessly false or misleading information.  *See Franks*, 438 U.S. at 164-72.  To void a search warrant and suppress the evidence that resulted from the search, a defendant must demonstrate, by a preponderance of the evidence, that (1) the affiant made "a false statement knowingly and intentionally, or with reckless disregard for the truth," and that (2) "the allegedly false statement is necessary to the finding of probable cause[.]"  *Id.* at 155-56.

A false statement "is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" *Awadallah*, 349 F.3d at 64-65 (quoting [*Canfield*, 212 F.3d] at 718).

> To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.

*Canfield*, 212 F.3d at 718 (quoting [*United States v. Trzaska*, 111 F.3d 1019,] 1027-28 [(2d Cir. 1997)]). Thus, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* (quotation omitted).

In the present matter, Defendant has failed to establish that any of the alleged false statements were necessary to Judge Keefe's finding of probable cause. Putting aside the alleged erroneous information, there was sufficient information to support probable cause. Detective Heid attached to his affidavit two sworn statements by witnesses who identified Defendant as the person who fired shots outside of Hoffman's Car Wash on March 25, 2012. *See* Dkt. No. 17-1. These sworn statements were photo arrays in which the witnesses identified Defendant. *See id.* Moreover, although Detective Heid did not state in his affidavit that the domestic incident report indicated that Defendant and Ms. Philpot do not currently live together, the incident report was included with the application for Judge Keefe's inspection. *See id.* at 11. This incident report establishes that Defendant and Ms. Philpot were formerly dating, that Defendant still had a key to the apartment, and that Defendant was living or frequently staying at the apartment until as recently as June 3, 2012. *See id.* Further, in the report, Ms. Philpot admits that she and

Defendant were the only ones who had keys to the apartment (other than the landlord).  *See id.* at 12.

Further, although Detective Heid's affidavit incorrectly states that Defendant was pulled over on January 2, 2011 instead of January 2, 2012, and that he was driving a blue Audi, these minor errors were not necessary to support probable cause.  Although Defendant was apparently driving Ms. Philpot's Acura at the time, the affidavit correctly states that the New York registration was FWR 1264.  *See id.* at 2.  At the time of the incident, the 2003 Audi station wagon was associated with the New York license plate FWR 1264, which was seen in the surveillance video provided by Hoffman's Car Wash.  *See id.*

Based on the foregoing, the Court denies Defendant's motion brought pursuant to *Franks v. Delaware* is denied.

**E.**    ***Brady* and *Giglio* material**

Defendant requests that the Court enter an Order directing the Government to provide him with all evidence favorable to him, including evidence that could be used for purposes of impeachment, as *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) require.  *See* Dkt. No. 16-1 at 12.  The Government asserts that it is aware of its obligations and has acknowledged its continuing obligation.  Based on these representations, the Court denies Defendant's motion without prejudice to renew if it becomes necessary for Defendant to do so.

**F.**    **Suppression of involuntary statements**

Defendant contends that his alleged inculpatory statements to police must be suppressed because they were involuntary and elicited in violation of his *Miranda* rights. *See* Dkt. No. 16-1 at 12. First, Defendant argues that, even if the statements he allegedly made at 677 Pawling Avenue and en route to the police station were deemed "spontaneous," they should still be suppressed because they were obtained as the result of an illegal search and seizure. *See id.* (citations omitted). Alternatively, Defendant contends that "even if the antecedent search and seizure had comported with the Fourth Amendment, the statements would be inadmissible due to the violation of defendant's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966)." *See id.* at 13. Defendant argues that the question posed to him by one of the detectives in the interrogation room at the police station constituted a custodial interrogation; and, therefore, *Miranda* warnings were required before being asked such a question. *See id.* at 13-16 (citation omitted).

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires that officers must advise an individual who is in custody of certain rights, including the right to have an attorney present during questioning, before government agents interrogate him. "Because *Miranda* warnings are intended 'to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights,' *Moran v. Burbine*, 475 U.S. 412, 425, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), it naturally follows that *Miranda*'s warning and waiver requirements apply only in the context of 'custodial interrogation,' *i.e.*, a person must have been both in custody and subjected to interrogation for statements made without warnings or waiver to be inadmissible in the government's case in chief." *United States v. Rommy*, 506 F.3d 108, 131-32 (2d Cir. 2007) (quotation and other citations omitted). "*Miranda* defined 'interrogation' as 'questioning initiated by law enforcement officers.'" *Id.* at 132 (quotation omitted). "The Supreme Court later refined this definition to include 'not only . . . express questioning, but also . .

. any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)) (other citation omitted); *see also Rosa v. McCray*, 396 F.3d 210, 220–21 (2d Cir. 2005); *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" *Id.* (quotation and other citations omitted).

"As *Miranda* itself recognized, however, '[v]olunteered statements of any kind are not barred by the Fifth Amendment' and, thus, do not require preliminary advice of rights." *Rommy*, 506 F.3d at 132 (quoting *Miranda v. Arizona*, 384 U.S. at 478, 86 S. Ct. 1602); *accord Rhode Island v. Innis*, 446 U.S. at 300. "In *Edwards v. Arizona*, the Supreme Court explained that, even if a defendant has asserted his Fifth Amendment right to counsel, if the defendant 'himself initiates further communication' with law enforcement, 'nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). *Edwards* cautioned, however, that

> [i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of [the defendant's Fifth Amendment rights] had occurred[.]

*Edwards*, 451 U.S. at 486 n.9.

First, as to Defendant's motion to suppress on the ground that his statements were obtained as the result of an illegal search and seizure, the motion must be denied. As discussed, the search and seizure were supported by a valid search warrant, issued with probable cause.

Next, Defendant argues that the question posed to him by one of the detectives in the interrogation room at the police station constituted a custodial interrogation; and, therefore, *Miranda* warnings were required before being asked such a question. During the hearing, Detective Heid testified that, prior to providing Defendant with *Miranda* warnings, he asked Defendant if the gun was loaded and, if so, how many rounds were in it. *See* Tr. # 1 at 63. Detective Heid claims that he asked this question because "[t]he forensics detective that was handling the weapon was trying to swab it for DNA and opened the cylinder to make it safe prior to doing so and was having difficulty handling it or opening – the cylinder." *See id.* According to Detective Heid, in response to the question, Defendant "went on talking about – that it was loaded, in sum and substance, that it was . . . loaded and couldn't give me a number how many rounds[.]" *See id.* at 64. Further, Defendant responded that it was his gun. *See id.* At this point, Detective Heid provided Defendant with *Miranda* warnings. *See id.* at 65-66.

In response to Defendant's motion, the Government has asserted that, "[t]his specific statement, although made voluntarily will not be used in the government's case-in-chief because the defendant made it in response to a police question before police Mirandized him. If, however, the defendant testifies, this statement is admissible as rebuttal evidence as to the defendant's credibility." *See* Dkt. No. 17 at 12. Upon review of the pre-*Miranda* statement and in light of the Government's position, the Court finds that the Government is precluded from using this statement in its case-in-chief. The Court reserves on whether this statement may be introduced to impeach Defendant's credibility. *See Harris v. New York*, 401 U.S. 222, 225-26 (1971).

Moreover, the Court finds that Defendant's post-warning statements were knowingly and voluntarily made and, therefore, admissible. "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.*

Defendant was asked one question by Detective Heid before he was *Mirandized*. At the hearing, Detective Heid's testimony made clear that there was no coercion or other circumstances intended to undermine Defendant's free will. Further, there is no indication that the detectives' conduct amounted to a deliberate, two-step "question first" interrogation tactic designed to undermine Defendant's *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600 (2004).

Finally, at the hearing Detective Heid admitted that, although he read to Defendant the *Miranda* warnings and that Defendant answered that he understood his rights, Detective Heid did not ask Defendant whether he waived his rights. *See* Tr. # 1 at 65-66. To the extent that Defendant is asserting that his post-*Miranda* statements must be suppressed because of this, the Court finds the argument to be without merit. According to the Supreme Court, although the *Miranda* requirement itself is rigid, this "rigidity" does not extend "to the precise formulation of the warnings given a criminal defendant." *California v. Prysock*, 453 U.S. 355, 359 (1981) ("*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures"). Thus, neither an express, written or oral statement of waiver is required to establish that it is knowing and voluntary. *See United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) (finding a

valid waiver where defendant answered questions during transport one day after being given his rights and without being asked whether he wanted to waive them); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974) (noting it is clear that a written waiver is not required and the absence of one does not bar the admission of a confession).  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010)); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("Waiver can be inferred from the actions and words of the person interrogated"); *United States v. Hall*, 724 F.2d 1055, 1059 (2d Cir. 1983) (finding a valid waiver where the defendant started answering questions after being advised of rights notwithstanding the officer's failure to ask him if he understood).

In the present matter, the evidence clearly established that Defendant acknowledged that he understood his rights and then knowingly and voluntarily waived those rights by answering the detectives' questions.  Defendant clearly indicated that he understood his rights, and then knowingly and voluntarily waived those rights.

Based on the foregoing, the Court grants in part and denies in part Defendant's motion to suppress his statements.


# IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss the Indictment is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for a bill of particulars is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to preclude evidence of uncharged crimes is **DENIED** without prejudice to renew; and the Court further

**ORDERS** that Defendant's motion to suppress physical evidence is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for *Brady* and *Giglio* material is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to suppress statements is **GRANTED in part** and **DENIED in part**;[5] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: October 16, 2013
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[5] As set forth above, Defendant's motion to suppress statements is only granted as to the answer he provided to Detective Heid while at the police station in response to Detective Heid's question, prior to receiving *Miranda* warnings.  As noted, the Court reserves on whether this statement may be introduced to impeach Defendant's credibility if he testifies at trial.